# THE STATE OF NEW HAMPSHIRE

# SUPREME COURT

**In Case No. 2020-0488, <u>Appeal of Anthony Paquet</u>, the court on August 10, 2021, issued the following order:**

Having considered the briefs and record submitted on appeal, we conclude that oral argument is unnecessary in this case. <u>See</u> <u>Sup. Ct. R.</u> 18(1). The petitioner, Anthony Paquet, appeals a decision of the New Hampshire Compensation Appeals Board (board) denying his claim for workers' compensation benefits on the basis that his injuries are not causally-related to a workplace incident. He argues that the board's decision is not supported by competent medical evidence, and that it is unjust or unreasonable. We affirm.

RSA chapter 541 governs our review of board decisions. RSA 281-A:43, I(c) (2010). Under RSA 541:13 (2007), we will not set aside the board's decision except for errors of law, unless we are satisfied, by a clear preponderance of the evidence, that it is unjust or unreasonable. <u>See</u> <u>Appeal of LeBorgne</u>, 173 N.H. 488, 493 (2020). As the appealing party, the petitioner has the burden of demonstrating that the board's decision was erroneous. <u>Id</u>. The board's findings of fact are presumed <u>prima</u> <u>facie</u> lawful and reasonable. RSA 541:13. In reviewing the board's findings, our task is not to determine whether we would have found differently or to reweigh the evidence, but rather, to determine whether the findings are supported by competent evidence in the record. <u>Appeal of Phillips</u>, 165 N.H. 226, 235 (2013). Thus, we review the board's factual findings deferentially. <u>LeBorgne</u>, 173 N.H. at 493. We review the board's rulings on issues of law <u>de</u> <u>novo</u>. <u>See</u> <u>Phillips</u>, 165 N.H. at 230.

To recover workers' compensation benefits, it was the petitioner's burden to establish that his injury arose out of and in the course of his employment. RSA 281-A:2, XI (Supp. 2020); <u>see</u> <u>Appeal of Redimix Cos.</u>, 158 N.H. 494, 496 (2009). To meet this burden, the petitioner was required to prove by a preponderance of the evidence that his work-related activities probably caused or contributed to his injury. <u>Redimix Cos.</u>, 158 N.H. at 496. The petitioner's burden of proof required that he establish, in part, medical causation – that his injury was actually caused by a work-related event or condition. <u>Id</u>.

The petitioner worked for the New Hampshire Department of Health and Human Service (DHHS) as a youth counselor from 1991 until April 2018. His medical records show that, beginning in the 1990s and throughout his employment with DHHS, the petitioner experienced symptoms associated with, according to DHHS's medical expert, "chronic degenerative spondylosis of the cervical spine with severe degenerative disc disease and uncovertebral joint and

facet hypertrophy and associated foraminal stenosis and lower cervical radiculopathy." These symptoms included chronic pain in the neck and right upper back that radiated into the right arm.

On July 25, 2017, the petitioner physically restrained a resident of the facility where he worked and brought the resident to the floor in a manner that, according to the board, did not result "in a soft landing." This incident caused the petitioner to suffer pain and bleeding to his nose, and pain to his left wrist, left knee, and shoulder. An incident report prepared by the petitioner contemporaneously does not identify any pain or injury to his neck or right arm as a result of the incident. Although the petitioner did experience some tingling in his hand on the day following the incident, he did not seek medical treatment, and continued to work for several more months.

The first time that the petitioner sought medical care following the July 2017 incident was on April 19, 2018. The provider's treatment notes for that visit state that the petitioner: (1) had "herniated cervical discs"; (2) had "had chronic upper back and neck pain for many years"; (3) had declined surgery after treating with a surgical specialist "many years ago"; (4) had been able to successfully treat prior "flares" of his symptoms through medication, trigger point injections, and ice and heat; (5) was trying to avoid surgery; (6) was presently experiencing "flares" that were worse and more frequent than in the past; (7) had "started to get intermittent tingling to [his] right fingers" that was worse than it had been previously; and (8) was "negative for weakness." The notes further state that there was "[n]o injury or trauma that triggered [the] recent flare," but that the petitioner wondered whether his recent "splitting [of] some cordwood . . . [may have] triggered it." The provider observed that the petitioner's last cervical MRI in 2006 showed severe degenerative disc disease "at C5/6 and C6/7," as well as "neural foraminal narrowing and impressions on the ventral surface of the anterior subarachnoid space."

The petitioner subsequently consulted with an orthopedic clinic. On a preprinted new patient history form, he described his condition as resulting from an automobile accident, and did not select "Injury at Work," another available response to the question. He described the onset of his condition as "Acute (Sudden)," rather than "Chronic Condition (>3 months)," and identified the onset date as "4/8/18." A note on the form states that he disclosed a "long hx of neck issues" and "increased pain April 8th while stacking wood." A treatment note from that clinic dated May 17, 2018 states that he identified a "motor vehicle accident many years ago" as having caused him "issues with chronic neck pain," and disclosed that he had "[r]ecently . . . noticed that his flare ups are becoming more frequent and more difficult to control," that "[e]arly in the spring" he had "started to notice that he was getting increased right-side hand paresthesias," and that he "was having difficulty picking things up and using his right hand." A physical examination revealed "4+/5 strength

2

in the right deltoid, biceps, and triceps," and diminished sensation "along the right lateral hand, medial hand and lateral forearm."

On July 18, 2018, the petitioner consulted with a neurosurgeon. The surgeon noted that the petitioner had "a very long-standing over 20 year history of right-sided neck and arm pain," that "[m]ore recently over the last year or so he has been noticing some weakness in his right hand . . . and severe pain going into his right hand," and that he "describes some vague numbness and paresthesias extending to the right arm." The surgeon "discussed with [the petitioner] that he does have significant degenerative disc disease and vital cord and nerve root impingement," ordered a right arm EMG and epidural steroid injection "for both diagnostic and therapeutic purposes," and determined that he would finalize the petitioner's treatment plan after he had reviewed the results of the follow-up testing. The EMG testing confirmed "a right C6 and C7 radiculopathy," and the epidural steroid injection provided the petitioner with pain relief for four days.

On August 15, 2018, the neurosurgeon ordered a second epidural steroid injection for further "diagnostic and therapeutic purposes," and determined that he would discuss surgical options with the petitioner after evaluating the results of the injection. Prior to undergoing the second injection, however, the petitioner awoke on August 27, 2018 with numbness in his right arm and was unable to move it. He presented to the neurosurgeon two days later "with severe pain in his right arm now and weakness that has been ongoing for about 1 week in his right arm and hand." The neurosurgeon examined the petitioner, noted that he had weakness "in his right triceps and his right hand intrinsic muscles" and "intolerable pain," and based on his symptoms, recommended emergency surgery. The neurosurgeon performed cervical fusion surgery on August 31, 2018, and based upon the petitioner's continued pain, performed a second cervical fusion on October 30, 2018. Due to infection, the petitioner underwent additional surgeries on November 15 and 21, 2018.

The first reference to the July 2017 incident in any of the petitioner's medical records is in a note from his primary care provider dated March 25, 2019. In that note, the provider indicated that at a follow-up visit with the petitioner for pain management, he stated that he was "applying for SSDI, medical retirement," and warned that the provider "should expect a barrage of papers." According to the note, the petitioner provided a list of several injuries he had sustained during the course of his employment with DHHS, including the July 2017 incident in which he "injured face, wrist, knee and shoulder. Neck extension injury – restraint with multiple injuries."

On March 1, 2019, the neurosurgeon completed a portion of the petitioner's application for supplemental sick leave. In response to the question whether the petitioner's health condition was work-related, the neurosurgeon checked both boxes stating, "Yes" and "No," crossed both

answers out, and then handwrote, "Unclear at this time." On August 5, 2019, the petitioner's attorney wrote to the neurosurgeon advising that he was going to pursue a workers' compensation claim on the theory that the July 25, 2017 incident was the "final blow" and a "significant" event in a list of several workplace injuries resulting in "cumulative trauma" that ultimately became disabling on April 19, 2018. The attorney defined "cumulative trauma" to mean that the petitioner's disability "should be considered a work related injury even though it didn't arise out of any one event." The attorney solicited the neurosurgeon's opinion as to that theory. The neurosurgeon responded by letter dated October 15, 2019, opining that "[i]t is more likely than not that [the petitioner's] occupational exposures did contribute to his symptomatic radiculopathy that ultimately required surgical decompression in the summer of 2018," and that although "[t]here were numerous preceding events, . . . the most notable precipitating event was likely the one in the summer of 2017."

The petitioner requested a hearing before the New Hampshire Department of Labor (department) identifying both July 25, 2017 and April 19, 2018, the date his alleged cumulative trauma allegedly became disabling, as the dates of injury. The department rejected both claims. Thereafter, the neurosurgeon provided a follow-up opinion that the July 2017 incident, "to a reasonable degree of medical probability, substantially contributed to his symptomatic radiculopathy and resulting surgery." The petitioner withdrew his cumulative trauma claim, and proceeded before the board solely on the basis that the July 2017 incident caused his disability.

DHHS countered the neurosurgeon's opinion with an opinion from its own medical expert, who reviewed the petitioner's medical records and observed that he had experienced "ongoing symptoms and treatment [associated with severe degenerative disc disease] without resolution for at least twenty years." DHHS's expert opined that the July 2017 incident "did not result in any appreciable anatomical injury or change in the degree of spondylosis," that "[t]here was no indication on subsequent x-rays or MRI in the preoperative period of any acute injury," and that "the studies all showed chronic degenerative change of the long-standing nature as evidenced by osteophyte formation, degenerative disc narrowing, and ligamentous hypertrophy" that "related back to imaging studies as far back as 2006." DHHS's expert found "no annotation of correlation between [the July 2017 incident] and anatomical or neurologic injury, including all of the nonoperative care, preoperative care, and surgical care – extending all the way through follow-up related to the surgical intervention in August 2018." DHHS's expert further observed that, although weakness in the petitioner's right arm had precipitated the August 2018 emergency surgery, the petitioner "did not complain of or have findings of upper extremity weakness until the week prior to surgery." DHHS's expert concluded:

4

Had that radiculopathy or neurologic weakness been attributable to the [July 2017 incident], as opposed to the natural progression of long-standing chronic degenerative change, one must expect that those neurologic symptoms, and in particular weakness, would have been present subsequent to and within reasonable chronologic proximity to the [July 2017 incident]. Therefore, if the impetus for surgery in August, 2018 was the neurological change, which first occurred just one week before the surgery and more than one year after the [July 2017 incident], the surgery cannot reasonably be attributed to or causally related to the [July 2017 incident]. Rather, the lack of neurological symptoms at the time of the workplace incident of 7/28/17 or shortly thereafter, indicates that the neurologic changes, which formed the basis for the indication for surgery, were the inevitable progression of preexisting degenerative change that had been documented for many years. And therefore, no causality can reasonably be drawn between the [July 2017 incident] and the underlying chronic degenerative spondylosis or later radiculopathy with right arm weakness, which led to the decision to perform surgery. By extension, one cannot conclude and should not attribute the initial cervical surgery of April 2018 [sic] as being causally related to or the sequellum, direct or indirect, of the [July 2017 incident]. Furthermore, as the initial surgery was not causally related to the [July 2017 incident], neither were the follow-on surgeries performed secondary to the complications of the first.

In denying the petitioner's claim, the board found DHHS's expert to be "more persuasive than" the neurosurgeon "because the medical record does not establish a consistent complaint by the [petitioner] that the [July 2017 incident] injured his neck thus bringing about the onset of the symptoms that brought him to seek consultation and treatment," and because "the symptoms complained of . . . were neither consistently reported nor noted in the medical record to be sequela of" the July 2017 incident. On appeal, the petitioner first argues that the board's decision is unsupported by competent medical evidence because the DHHS's expert relied upon an allegedly "incomplete set of relevant medical records," and because DHHS's expert allegedly had "a complete lack of knowledge of the undisputed testimony" before the board. We disagree.

At the outset, we note that the parties dispute the extent to which DHHS's expert lacked relevant medical records. The petitioner contends that it is "undisputed" that DHHS's expert did not review "more than 200 pages" from his primary care provider. DHHS counters that, "at most, 2 medical records between April 2018 and the surgery in August 2018" from the petitioner's primary care provider, including the April 19, 2018 treatment note, were not included in the records reviewed by DHHS's expert. Those two records, according to DHHS, are consistent with the expert's opinion.

The board is entitled to rely upon a medical opinion based solely upon a review of the claimant's medical records so long as the opinion provides support for the board's decision. Appeal of Walker, 144 N.H. 181, 184 (1999). Regardless of whether the documents missing from the review of DHHS's expert consisted of more than 200 pages or two records, the only missing record that the petitioner specifically identifies as relevant is the April 19, 2018 treatment note. The petitioner contends that the absence of this record is significant because it reflected numbness in his right hand, which he contends is "the first presentation in a medical record of a neurologically significant finding" prior to August 2018. The petitioner further emphasizes the board's finding that the petitioner complained of tingling on the day after the July 2017 incident and testimony from his supervisor that he told him about "arm weakness, or arm pain, or neck pain" after the July 2017 incident, testimony that was unavailable to the DHHS's expert.

The neurological changes that were the "impetus" for emergency surgery, however, were severe pain and weakness that had been ongoing for one week. As DHHS points out in its brief, the records that its expert reviewed, and specifically discussed in his report, included the records from the orthopedic clinic and the neurosurgeon from May through August 2018, which also reflected an increase in "right-side hand paresthesias" that had begun in the early spring of 2018, increased pain, and some diminished strength. Moreover, as with all of the medical records prior to March 25, 2019, there is no mention of the July 2017 incident in the April 19, 2018 treatment note.

Contrary to the petitioner's argument, Appeal of Walker does not compel a different result. Unlike the claimant in Walker, the petitioner in this case did not seek medical treatment for nearly nine months after the July 2017 incident, and when he did seek treatment and had the opportunity to attribute his symptoms to the July 2017 event, he specifically declined to attribute them to any work-related event. See id. at 185. Nor did the petitioner, unlike the claimant in Walker, identify the relevant injury on the July 2017 incident report. See id. We note that the neurosurgeon likewise declined to attribute the petitioner's symptoms to a work-related event until after the petitioner's counsel solicited his opinion, stating instead that it was "unclear" whether the condition was work-related. Faced with conflicting expert testimony, the board was free in this case to credit the testimony of DHHS's expert over that of the neurosurgeon. Appeal of Dean Foods, 158 N.H. 467, 474 (2009). We conclude that the board's decision is supported by competent medical evidence.

The petitioner next argues that the board's decision is clearly unjust and unreasonable because a "hot mic" moment allegedly demonstrates that the board relied upon its own lay opinion. Specifically, he relies upon the following comments, captured in the transcript during a break in the proceeding before

6

the board, as demonstrating that Joseph A. Dickinson, the panel's chair, diagnosed him as having suffered from a stroke:

> MR. DICKINSON:  This is long.  Now we can talk.  I thought he had a stroke.
> MR. NORTON:  Who?
> MR. DICKINSON:  The claimant.  Arm flopping.  Speech is a little off.  And it's – if it's his right arm, that speech center, would explain the conversation.
> MR. NORTON:  He doesn't say he had a stroke though.

Later in the proceeding, during DHHS's cross-examination of the petitioner, Dickinson stated, "Look at his right shoulder drop."  We note that, although both parties were present when Dickinson made the latter comment, neither party objected or otherwise sought clarification of it.

Nothing in the board's decision indicates that it believed the petitioner's symptoms were related to any medical condition other than his undisputed cervical disc disease.  We note that Dickinson stated that he "thought" the petitioner had a stroke, not that he "thinks" he had a stroke.  As DHHS observes, the petitioner has in fact experienced substantial damage to the muscles in his right arm as a result of his condition.  Indeed, the record reflects that he was unable even to raise his right hand to be sworn in, and that he speaks in a manner that can be difficult to understand.   We conclude that Dickinson's comments merely reflect his observations of the witness's appearance, and do not demonstrate that Dickinson, or any member of the board, improperly attributed the petitioner's condition to a stroke.

The petitioner next argues that the board's decision was clearly unjust and unreasonable because, in essence, his expert was more credible than DHHS's expert.  He emphasizes that the neurosurgeon was his treating physician, that the neurosurgeon was not required to provide an opinion favorable to him, that DHHS did not report the July 2017 incident to the department until February 2019,[1] and that DHHS's expert referenced an incorrect date in his report for the July 2017 incident.

As the board noted in its decision, "the medical record does not establish a consistent complaint by the [petitioner] that the [July 2017 incident] injured his neck thus bringing about the onset of the symptoms that brought him to seek consultation and treatment."  Indeed, the medical record contains no reference to the July 2017 incident at all until March 25, 2019, nearly two

---

[1] Although the petitioner raises this fact multiple times in his brief and reply brief, he fails to explain how DHHS's delayed reporting of the July 2017 incident would have caused him to delay seeking medical treatment, or to neglect mentioning the incident to his medical providers from April 19, 2018 until March 25, 2019.

7

years after the incident.  As noted above, even as late as March 1, 2019, the neurosurgeon declined to attribute the petitioner's condition to a work-related event.  Under the circumstances, we cannot conclude that the board's decision was either erroneous as a matter of law, or clearly unjust or unreasonable. LeBorgne, 173 N.H. at 493.

Affirmed.

MacDonald, C.J., and Bassett, Hantz Marconi, and Donovan, JJ., concurred.

**Timothy A. Gudas,
Clerk**
